**Delbert FAULKNER, Petitioner,**

v.

**Martin MAKEL, Respondent.**

**Civ. A. No. 92–CV–77142–DT.**

United States District Court,
E.D. Michigan, S.D.

Dec. 15, 1993.

current action, their roles are reversed—Poly is the plaintiff and TSE is the defendant.

Delbert Faulkner, pro se.

Lisa C. Ward, Michigan Dept. of Atty. Gen., Habeas Corpus Div., Lansing, MI, for respondent.

## MEMORANDUM OPINION AND ORDER

GADOLA, District Judge.

### I. Introduction and Procedural History

Petitioner Delbert Faulkner is a state inmate at the Kinross Correctional Facility in Kincheloe, Michigan. This matter is before the Court on petitioner's *pro se* application for the writ of habeas corpus under 28 U.S.C. § 2254.

On January 28, 1983, a jury in Macomb County Circuit Court found petitioner guilty of first-degree felony murder. In the words of the Michigan Court of Appeals, the State's

theory at trial was that [petitioner] and Ron Taylor conspired to steal decedent/victim Larry Hooper's motorcycle, that the robbery went awry, and that [petitioner] shot and killed Hooper during the course of the attempted robbery. Before trial, Ron Taylor was shot to death. Consequently, [the State] called Taylor's fiancee, Deborah Ruman, as a witness to testify regarding Taylor's role in the incident.

See *People v. Faulkner,* Michigan Court of Appeals No. 70229 (March 27, 1985) at 1. The trial judge sentenced petitioner to life in prison for the crime.

In a claim of appeal before the Michigan Court of Appeals, petitioner raised questions about (1) the admission into evidence of testimony by Deborah Ruman and a physician, (2) the trial court's denials of his motions for new trial, and (3) photographic show-ups. The Court of Appeals affirmed petitioner's conviction. See *People v. Faulkner,* Michigan Court of Appeals No. 70229 (March 27, 1985).

In the Michigan Supreme Court, petitioner subsequently challenged (1) the prosecutor's alleged failure to provide a laboratory report, (2) the assistance of counsel concerning pretrial identification procedures, (3) evidentiary errors regarding the alleged conspiracy, and (4) the prosecutor's reference to his (petitioner's) post-arrest silence. The Michigan Supreme Court denied petitioner's delayed application for leave to appeal because it was not persuaded that it should review petitioner's questions. See *People v. Faulkner,* Michigan Supreme Court No. 76831 (December 17, 1985).

Next, petitioner filed a delayed motion for new trial. On March 30, 1987, the trial court held an evidentiary hearing on the issues, and on May 5, 1987, the trial court denied petitioner's delayed motion for new trial. See Answer to Habeas Petition, attachment 4.

Petitioner then applied for leave to appeal in the Michigan Court of Appeals. He challenged (1) the prosecutor's alleged misrepresentation of a laboratory report, use of false testimony, and reference to post-arrest silence, (2) the photographic show-ups, (3) the trial court's interpretation of the law on conspiracy and failure to instruct on voluntary manslaughter, and (4) the assistance of trial and appellate counsel.

In a standard order, the Michigan Court of Appeals denied petitioner's application for leave to appeal after concluding that petitioner's claims lacked merit. See *People v. Faulkner,* Michigan Court of Appeals No. 108758 (October 26, 1988). Petitioner raised the same issues in a delayed application for

leave to appeal in the Michigan Supreme Court, which also denied leave to appeal in a standard order. *See People v. Faulkner,* Michigan Supreme Court No. 84892 (August 23, 1989).

In 1989, petitioner filed a second delayed motion for new trial. His sole issue was:

WHETHER [HE] WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR MISREPRESENTED A LABORATORY REPORT WHICH FOUND BLOOD EMBEDDED BY A BULLET FIRED INTO A TELEPHONE DIRECTORY, ALTHOUGH NEITHER THE VICTIM NOR DEFENDANT (THE ONLY PARTIES PRESENT) HAD THAT TYPE OF BLOOD?

The trial court denied petitioner's second delayed motion for new trial. *See* Answer to Habeas Petition, attachment 7. In a third round of appeals, the state courts denied petitioner's applications for leave to appeal the trial court's decision. *See People v. Faulkner,* Michigan Court of Appeals No. 124790 (March 16, 1990); *People v. Faulkner,* Michigan Supreme Court No. 88729 (September 28, 1990).

On December 16, 1992, petitioner filed the pending habeas petition. He raises the following grounds for relief:

I.  WAS PETITIONER DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR MISREPRESENTED THE RESULTS OF AN EXCULPATORY LABORATORY REPORT TO TRAIL (sic) COUNSEL?

II.  WAS PETITIONER DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE:

A.  COUNSEL FAILED TO INQUIRE FROM SOURCES OTHER THAN THE PROSECUTOR'S EXPERT WITH REGARD TO THE EXCULPATORY LABORATORY REPORT?

B.  COUNSEL FAILED TO DEMONSTRATE THAT A PHOTOGRAPHIC DISPLAY TOOK PLACE WHERE COUNSEL SHOULD HAVE BEEN PRESENT?

C.  COUNSEL FAILED TO DEMONSTRATE THAT THE TAINTED PHOTO DISPLAY, COUPLED WITH A SUGGESTIVE PRELIMINARY EXAMINATION, IMPROPERLY INFLUENCED THE WITNESS'S (sic) IDENTIFICATION?

III.  WAS PETITIONER DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR PERMITTED DEBORAH RUMAN, ITS KEY WITNESS, TO GIVE FALSE TESTIMONY WITH REGARD TO:

A.  THE CONSIDERATION SHE RECEIVED IN EXCHANGE FOR HER TESTIMONY?

B.  HER NON–INVOLVEMENT WITH HEROIN USE WHEN, IN FACT, SHE WAS A MAJOR HEROIN DISTRIBUTOR?

IV.  WAS PETITIONER DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL BECAUSE THE LAW USED TO ESTABLISH THE CONSPIRACY BETWEEN HIMSELF AND RONALD TAYLOR WAS MISINTERPRETED?

V.  WAS PETITIONER DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE THE EVIDENCE SUPPORTED AN INSTRUCTION ON VOLUNTARY MANSLAUGHTER BUT, BECAUSE TRIAL COUNSEL REQUESTED THAT ONLY VOLUNTARY MANSLAUGHTER BE GIVEN, THE COURT FAILED TO GIVE THAT CHARGE?

*See* petitioner's Brief in Support at ii. Petitioner has exhausted his state court remedies on these claims. 28 U.S.C. § 2254(b) and (c); *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

On August 9, 1993, respondent filed his answer to the petition. He argues that (1) petitioner's claims concerning the prosecutor and the assistance of counsel are without merit, (2) petitioner's conspiracy claim is not cognizable on habeas review, and (3) proce-

**1246**

'dural rules bar the Court's review of petitioner's claim about the jury instructions.

## II. Discussion

### A. Alleged Prosecutorial Misconduct

Petitioner's first claim is that the prosecutor misrepresented evidence and thereby denied him a fair trial.

#### 1. Alleged misrepresentation of results of laboratory report

Petitioner claims that serologist David Woodford misrepresented the results of a laboratory report and that the prosecutor was responsible for the misrepresentation and suppression of exculpatory evidence. The evidence at trial suggested that petitioner and Larry Hooper struggled when petitioner attempted to steal Larry Hooper's motorcycle. The prosecutor speculated that Hooper was killed and that petitioner was shot in the leg during the altercation. Petitioner, however, denied any involvement in the crime.

Serologist David Woodford testified at trial that blood stains found at the scene of the crime were type O. T at 383.[1] The parties stipulated on the record that Larry Hooper's blood type was O and that petitioner's blood type was A. T at 638–639.

After trial, petitioner obtained a laboratory report revealing that a bullet deposited type B blood in a telephone directory at the crime scene. In an evidentiary hearing held on March 30, 1987, serologist Woodford confirmed that he found the B and H factors in the telephone directory. EH at 24.[2] Woodford claimed that H indicates type O blood. EH at 28. Woodford testified that he found the AB factor on wood grain paneling at the crime scene and that a person with type A blood could have donated the blood stain on the paneling. EH at 29.

Petitioner argues that Woodford's conclusion that H factor indicates type O blood was misleading because everyone supposedly has the H factor. Petitioner claims that both he and Larry Hooper could have been excluded as donors of the bloodstains found at the crime scene. Petitioner bases this conclusion on evidence that he has type A blood, Larry Hooper had type O blood, and the blood stain in the telephone directory contained type B blood. Petitioner contends that the outcome of the trial would have been different if the jury had known about the B blood. Petitioner argues that there was no evidence to establish when the AB blood stain was deposited on the wood grain paneling.

The Supreme Court has held that

> suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *see Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972) (noting that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"). Prosecutors violate the Fourteenth Amendment if they allow false evidence to go uncorrected. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). Evidence is material if "its suppression undermines confidence in the outcome of the trial." *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985). The Court must evaluate any omitted evidence in the context of the entire record. *United States v. Agurs,* 427 U.S. 97, 112–113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976).

■ The Court finds that David Woodford's discovery of type B blood in the telephone directory was not material exculpatory evidence. If Woodford had testified fully about his findings, he probably would have testified that bacteria or dust over time could have mimicked type B blood. EH at 29. Additionally, Woodford could have testified that petitioner was a possible donor of the AB blood stain in the wood paneling. EH at 29. Thus, additional testimony by Woodford

---

1. T refers to the transcript of the trial, consisting of four (4) volumes, consecutively paginated from 1–735.

2. EH refers to the transcript of the evidentiary hearing held on March 30, 1987.

concerning the evidence petitioner finds exculpatory would have had limited value to petitioner.

The absence of evidence about the B factor on the telephone directory did not prevent defense counsel from arguing that petitioner's blood type was not present at the crime scene. T at 676–677. Also, Deborah Ruman implicated petitioner when she testified about Ronald Taylor's conversations. *See* footnote 6. Therefore, if David Woodford had testified about finding type B blood at the crime scene, the testimony would not have exculpated petitioner.

Additionally, the prosecutor in this case testified at the evidentiary hearing that he gave defense counsel a copy of all police reports that he had. EH at 41–42. The prosecutor testified that he had discussed David Woodford's findings and analysis with Woodford and defense counsel. EH at 43–44. Woodford did not testify fully about his findings because of the influence of age on the samples and because the prosecutor, defense counsel, and Woodford thought that additional testimony would confuse the jury. EH at 30, 43–44.

Defense counsel recalled the discussion with the prosecutor and David Woodford. EH at 51. Defense counsel assumed that he had discussed the report with petitioner because that was his standard modus operandi. EH at 58.

To conclude, nothing in the testimony suggests that serologist David Woodford misrepresented facts or that the prosecutor suppressed material exculpatory information. Further, the alleged omission did not affect the outcome of the trial.

### 2. *Testimony of Deborah Ruman*

#### a. *Consideration for Testimony*

■ Petitioner claims that officials illegally rewarded Deborah Ruman for her testimony against him. According to petitioner, the prosecutor should have disclosed that Ruman received consideration for her testimony.

The prosecutor testified at an evidentiary hearing that he did not promise anything to Deborah Ruman for her testimony against petitioner. EH at 45–46. The prosecutor further testified that he had made it very clear to Deborah Ruman that he could not and would not give her any consideration. EH at 45–46. The prosecutor was present when police officer Jack Baird asked Deborah Ruman to assist Officer Baird with other investigations. EH at 45. However, the prosecutor in this case did not prosecute the State's case against Deborah Ruman and did not attempt to enhance Ruman's credibility by suggesting that she was an undercover agent. EH at 45–48.

Officer Jack Baird testified that he had promised to do everything he could to get Deborah Ruman out of prison if she helped him with investigations into drug trafficking. EH at 93, 95. Officer Baird was successful in his attempt to release Deborah Ruman, but he never heard the prosecutor in this case make any promises to Ruman. EH at 93, 95. Officer Baird had no involvement in petitioner's case. EH at 90.

The record does not support petitioner's contention that Deborah Ruman received consideration for her testimony in his case. Therefore, the prosecutor was not remiss for allegedly failing to divulge additional information about Deborah Ruman.

#### b. *Addiction to Heroin*

■ At trial, the prosecutor elicited testimony from Deborah Ruman concerning her drug addiction. She testified that she had been a drug addict, but that she had abstained from using heroin for about nine (9) months or a little longer. T at 288–289. On cross examination, Deborah Ruman said that she had not used drugs since April of 1982. T at 328–329. Petitioner alleges that Deborah Ruman was a major heroin distributor until August of 1982. Petitioner claims that Deborah Ruman's credibility would have been undermined if the jury had known the extent of Ruman's drug activity. Petitioner argues that the prosecutor in his case misrepresented the truth about Deborah Ruman's heroin activity and then vouched for her credibility in his closing argument.

The record does not support petitioner's contention that the prosecutor suppressed material evidence concerning Deborah Ruman's drug activity. The prosecutor elicited

information from Ruman about her drug addiction and drug conviction. Whether Deborah Ruman's drug problem extended until April or August of 1982 probably would not have affected the jury's evaluation of her. The length of Deborah Ruman's involvement with drugs did not prevent defense counsel from arguing at trial that Ruman was a junkie. T at 671. Petitioner's claim has no merit.

## B. *Assistance of Counsel*

■ Petitioner claims next that he was denied his Sixth Amendment right to the effective assistance of trial counsel. In the words of the Supreme Court, petitioner must show

> that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [petitioner] by the Sixth Amendment. Second, [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive [petitioner] of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The standard of performance is reasonably effective assistance under prevailing professional norms. *Id.* at 687–688, 104 S.Ct. at 2065. The Court will not question matters involving trial strategy and must presume that counsel rendered effective assistance. *Id.* at 689–690, 104 S.Ct. at 2065–66; *United States v. Chambers,* 944 F.2d 1253, 1272 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992), *and cert. denied sub nom. Lucas v. United States,* —— U.S. ——, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). The standard of review for determining whether an attorney's errors were prejudicial is whether there is a reasonable probability that the result of the proceeding would have been different absent the error. *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068.

## 1. *Alleged failure to inquire from sources other than the prosecutor's expert regarding exculpatory laboratory reports*

Petitioner claims that trial counsel should have questioned a source other than serolo-

gist David Woodford about the accuracy of Woodford's findings. Petitioner alleges that, if defense counsel had made the inquiry, he would have discovered that type B blood was in the telephone directory. Petitioner apparently believes that the jurors would have concluded someone else was wounded at the crime scene because neither he nor Larry Hooper had type B blood.

David Woodford was a forensic serologist for the Michigan State Police Crime Laboratory at the time of petitioner's trial. T at 378. When questioned at trial about his training, Woodford spoke about his qualifications and said that he had been qualified as an expert court witness on approximately fifteen (15) occasions. T at 378–379. Petitioner's attorney apparently found Woodford to be qualified, for he explicitly declined to voir dire Woodford on his qualifications, and he did not cross examine Woodford about his qualifications. T 379, 384–385. The trial court found Woodford qualified to testify on serology. T at 380.

■ At the time of trial there was no apparent reason to challenge Woodford's findings. Woodford presented himself as an expert, and he had discussed his analysis of the blood samples, including his finding of type B blood, with the prosecutor and defense counsel. EH at 24–25. Given these facts, defense counsel was not deficient for allegedly failing to challenge Woodford's findings.

Moreover, the other evidence against petitioner was overwhelming. There is not a reasonable probability that the result of the proceeding would have been different had David Woodford testified about the presence of type B blood at the crime scene. Defense counsel's performance, therefore, was not deficient; even if it was deficient, it was not prejudicial.

## 2. *Alleged failure to demonstrate that a photographic display took place without counsel*

Petitioner claims that trial counsel failed to demonstrate that the photographic show-ups required the presence of defense counsel.

Petitioner argues that a police officer should not have shown his photograph in the absence of counsel because the criminal investigation had focused on him, and he was readily available for a line-up.

■ Although defense counsel failed to convince the trial court that petitioner should have had the assistance of counsel at the photographic show-up, he did raise the issue. *See* WH at 813–814.[3] The Michigan Court of Appeals agreed with the trial court that petitioner had no right under state law to the assistance of counsel at his photographic show-up. *See People v. Faulkner,* Michigan Court of Appeals No. 70229 (March 27, 1985) at 5. This Court therefore concludes that defense counsel was not deficient for not prevailing on this issue.

■ Petitioner's subsidiary argument that he was entitled to counsel at his photographic show-up has no merit. Petitioner had no constitutional right to counsel at the photographic show-up. *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). The state courts have determined that petitioner had no right under state law to the assistance of counsel at his photographic show-up. Even if he had the right under state law, the Court may not grant habeas corpus relief on the basis of an error of state law. *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984); *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982).

**3. *Alleged failure to demonstrate that the photo display and preliminary examination improperly influenced the witness' identification***

**a. *Photographic Show-up***

Petitioner alleges that counsel failed to demonstrate that a tainted photo display improperly influenced a witness' identification of him. "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic iden-

tification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

■ Witness Martin Vazana lived across the street from Larry Hooper, the crime victim. T at 143–144. Vazana identified petitioner at the preliminary examination as the man he saw walking down his street on July 29, 1982. WH at 790–791; PE at 27–28.[4] Martin Vazana did not attend a line-up. PE at 33, 36. He also had not seen petitioner at any other time between the incident on July 29, 1982, and the preliminary examination. PE at 33, 35–36. Vazana testified that the photographs he viewed shortly after the alleged murder did not influence him to identify petitioner. WH at 812.

Officer Roger Barnett testified that he showed Martin Vazana two sets of six photographs. WH at 801–802. Officer Barnett claimed that he did not point out any picture to Vazana and did not tell Vazana that there was a possible suspect in the photographs. WH at 803. He also did not tell Vazana that petitioner's picture was in the second set of photographs. WH at 803.

Defense counsel found that the pictures were not suggestive in any way. T at 813–814. This Court concludes that the photographs were not tainted and that defense counsel's performance concerning the photographic display was not deficient.

Moreover, the first set of photographs did not contain a photograph of petitioner. WH at 802. The second set of photographs did include a picture of petitioner, but Martin Vazana did not identify anyone from either set of photographs. WH at 789–790, 802–803, T at 410–411. Therefore, even if defense counsel's performance was deficient concerning the photographic display, defense counsel's performance was not prejudicial.

---

3. WH refers to the Wade Hearing held on January 5, 1983. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

4. PE refers to the preliminary examination on September 3, 1982.

### b. *Identification at Preliminary Examination*

According to petitioner, trial counsel failed to demonstrate that a suggestive identification procedure at the preliminary examination influenced Martin Vazana's identification of him. Petitioner argues that Martin Vazana's observation of him in the courtroom before the preliminary examination was impermissibly suggestive and unreliable.

Defense counsel did challenge Martin Vazana's identification of petitioner. He raised the issue before trial at a Wade hearing and during trial. Defense counsel conducted an effective cross examination at trial during which he focused on Martin Vazana's observation of the alleged suspect on July 29, 1982. T at 150–159. Defense counsel also brought out the fact that Martin Vazana had expressed some uncertainty about his ability to identify the person after the initial incident. T at 159–160.

Defense counsel appropriately raised the issue before trial and, given the other evidence, did an adequate job of presenting a defense of misidentification during trial. Defense counsel therefore was not deficient in handling the issue of pretrial identification.

Regarding the pretrial identification itself, the Court must determine whether it was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [petitioner] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *see United States v. Hill*, 967 F.2d 226, 229–230 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 438, 121 L.Ed.2d 357 (1992). If petitioner establishes that the pretrial identification was impermissibly suggestive, the Court must ask "whether, under the totality of the circumstances, the testimony was nevertheless reliable." *Id.* at 230.

Martin Vazana identified petitioner at the preliminary examination as the man he saw walking down the street on July 29, 1982. WH at 790–791, PE at 27–28. Vazana was in the courtroom about an hour before the preliminary examination, and he saw petitioner brought into the courtroom just before the hearing. WH at 798. Because Martin Vazana had not attended a line-up or seen petitioner at any other time between July 29, 1982, and the preliminary examination, the Court could deem his identification of petitioner at the preliminary examination to be suggestive.

The Court therefore will consider whether, under the totality of the circumstances, the identification was reliable despite the allegedly suggestive confrontation procedure. The Court must analyze the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the amount of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *United States v. Hill*, 967 F.2d at 230.

(1) *Opportunity to view the criminal.* Martin Vazana testified that, while he was clipping his rosebushes on July 29, 1982, between 11:45 a.m. and 12:15 p.m., he saw a man across the street. WH at 787, T at 144–145. He observed the man for two (2) to four (4) minutes. WH at 788, T at 145. He saw the man's face. WH at 787. At one point, the man came within fifty (50) feet of him, and nothing obstructed his view. WH at 792, T at 147.

(2) *Witness' degree of attention.* Martin Vazana glanced at the man two (2) to four (4) times. WH at 788, T at 145. He was not concerned about his dog, which was in the yard with him. T at 152–153. He apparently told Detective Barnett previously that he was concerned about his dog. T at 153–154, 408.

(3) *Accuracy of description.* About three (3) days after the crime, Martin Vazana described the man to police as being about 6'2", 185 to 195 pounds, brown hair of medium or shoulder-length, and unshaven. WH at 788, 792–793, T at 145–146, 151–152. Petitioner is 5'10" and at trial was between 165 and 167 pounds. T at 573–574. Another witness said that petitioner had had a thin beard and a moustache on July 29, 1982, and had had a

haircut during mid-August, 1982. T at 241–242, 274. Before the haircut, petitioner's hair had been "bushy like an Afro." T at 272.

(4) *Certainty of identification.* The record does not reflect whether Vazana was sure of his identification at the preliminary examination. When he first gave Officer Barnett a description of the suspect, he informed Officer Barnett of the possibility that he would not be able to identify the person again. WH at 812, T at 160–161. He testified at the Wade Hearing, however, that he based his identification at the preliminary examination on facial features. WH at 791. At trial, Martin Vazana was sure that petitioner was the person that he saw on July 29, 1982. T at 161.

(5) *Time between the crime and confrontation.* The crime allegedly occurred on July 29, 1982. The preliminary examination was on September 3, 1982, slightly more than one month after the crime occurred.

To summarize, Martin Vazana had a good opportunity to view the suspect, and he was attentive. His description of the man he saw varied in height and weight from petitioner's appearance. He was sure that petitioner was the person he saw, but the lapse of time between the crime and the confrontation was considerable. The totality of the circumstances suggests that Martin Vazana's pretrial identification of petitioner was somewhat reliable.

█ In any event, a court may permit a witness to testify at trial about his pretrial identification of a defendant. *United States v. Perry,* 991 F.2d 304, 311 (6th Cir.1993).[5] The Supreme Court has not extended the exclusionary rule to in-court identifications

that were suggestive because of the setting. *United States v. Domina,* 784 F.2d 1361, 1369 (9th Cir.1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987). Further, petitioner had no constitutional right to an in-court line-up or other means of lessening the suggestiveness of the in-court identification. *Id.; United States v. Davies,* 768 F.2d 893, 903 (7th Cir.), *cert. denied sub nom Kaprelian v. United States,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985); *United States v. Williams,* 436 F.2d 1166, 1168 (9th Cir.1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654 (1971). The fact that petitioner might have been singled out as the object of a possible identification is not dispositive. *United States v. Domina,* 784 F.2d at 1370–1371.

Even if the stated claims of petitioner in this regard are valid, the question of guilt or innocence did not depend entirely on Martin Vazana's in-court identification. Other evidence at trial, particularly Deborah Ruman's testimony, was overwhelming on the question of guilt. *See* footnote 6 below. Therefore, the admission of Martin Vazana's identification testimony could not have had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). The alleged error was harmless.

### C. *Alleged Misinterpretation of Law on Conspiracy*

█ Petitioner claims next that the trial court misinterpreted the law on conspiracy. Petitioner further claims that the trial court erroneously admitted into evidence Deborah Ruman's testimony regarding the alleged conspiracy between him and Ronald Taylor.[6]

---

5. Although the Court in *Perry* relied in part on Fed.R.Evid. 801(d)(1)(C), the pertinent Michigan Rule of Evidence is identical. *See* M.R.E. 801(d)(1)(C).

6. Deborah Ruman testified as follows. She lived with Ronald Taylor, who told her that he intended to find someone to assist him in stealing Larry Hooper's motorcycle. T at 289–291. Ronald Taylor took her to see the person who would assist him; on the Friday before Larry Hooper was killed, Ronald Taylor took her to petitioner's house. T at 292. At that time, she heard Ronald Taylor say to petitioner that there was a real nice bike and that it could bring in a lot of money. T

at 794. Petitioner had said, "About how much money?" T at 294. On the night before Larry Hooper was killed, Ronald Taylor told her that he planned to park about a block away from Larry Hooper's house and that petitioner was expected to go to the house, to get the keys, and to take the bike. T at 294–296. On July 29, 1982, Ronald Taylor dropped her off at the welfare office. T at 296–297. He left, came back about 10:30 a.m., and left a second time, saying that he was going to pick up petitioner. T at 297. About 12:30 or 1:00, he returned angry and said, "It all went wrong." T at 298, 307. On that evening or on the following evening, Ronald Taylor put down a newspaper and said, "It

Petitioner contends that the trial court should not have admitted the statements attributed to Ronald Taylor unless the prosecution proved the conspiracy independent of Taylor's hearsay statements.

The Court may not grant the writ for a perceived error of state law. *Pulley v. Harris,* 465 U.S. at 41, 104 S.Ct. at 874; *Smith v. Phillips,* 455 U.S. at 221, 102 S.Ct. at 948. Moreover, federal courts generally must adhere to state court interpretations of state law. *Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983); *Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S.Ct. 1881, 1886, 44 L.Ed.2d 508 (1975); *Smith v. Sowders,* 848 F.2d 735, 739 (6th Cir.), *cert. denied,* 488 U.S. 866, 109 S.Ct. 169, 102 L.Ed.2d 139 (1988); *Oviedo v. Jago,* 809 F.2d 326, 328 (6th Cir.1987); *Duffy v. Foltz,* 804 F.2d 50, 54 (6th Cir.1986). The Court may grant habeas corpus relief only if the error deprived petitioner of a fundamentally fair trial. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1354 (6th Cir.1993).

The trial court admitted Deborah Ruman's testimony into evidence in part as proof of statements of a co-conspirator made during a conspiracy. The Michigan Court of Appeals found that there was independent proof of a conspiracy and that the trial court properly admitted Ruman's testimony about Ronald Taylor's statements on the night before the murder as a co-conspirator's admission. *See People v. Faulkner,* Michigan Court of Appeals No. 70229 (March 27, 1985) at 2–3.

This Court adheres to the state court's interpretation of the evidentiary question. Admission of the evidence did not deprive petitioner of a fundamentally fair trial.

### D. *Absence of Instruction on Voluntary Manslaughter*

Petitioner's final claim is that the trial court should have instructed the jury on voluntary manslaughter. He contends that the evidence at trial supported an instruction on the lesser included offense of voluntary manslaughter. Specifically, he alleges that the evidence suggests he killed Hooper due to temporary excitement resulting from being wounded during the altercation with Larry Hooper. He argues that the trial court's failure to charge the jury on voluntary manslaughter, precluded the jury from considering his theory of defense.

■ Respondent argues that petitioner's failure to object at trial precludes the Court from considering his claim on habeas review. *See* M.C.R. 2.516(C). The Court, however, agrees with petitioner that no state court clearly and expressly relied on a state procedural default when reviewing the claim. *See Coleman v. Thompson,* ⸺ U.S. ⸺, ⸺, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).[7] Consequently, this Court may review petitioner's claim on the merits.

■ Generally, errors in instructions to the jury do not involve the deprivation of federal constitutional rights. *Gemmel v. Buchkoe,* 358 F.2d 338, 340 (6th Cir.1966), *cert. denied,* 385 U.S. 1021, 87 S.Ct. 723, 17 L.Ed.2d 561 (1967). The issue in collateral proceedings is whether the ailing instructions so infected the entire trial that the resulting conviction violates due process. *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). The issue is not whether the instructions were undesirable, erroneous, or even universally condemned. *Id.* (quoting *Cupp v. Naughten,* 414 U.S. at 146, 94 S.Ct. at 400).

■ A trial court's failure to instruct on lesser included offenses in noncapital cases generally is not "an error of such character

---

wasn't supposed to happen this way. Larry wasn't supposed to be killed." T at 308–311. Ronald Taylor also said that petitioner had been shot in the leg. T at 311. On the Monday after Larry Hooper was killed, petitioner came over to their apartment and was limping. T at 311–312. Ronald Taylor then said to petitioner that he had not wanted Larry Hooper to become hurt or killed. T at 318. Petitioner had responded that "it had to be that way" because there had been a struggle. T at 318–319.

7. *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), is retroactive. *McBee v. Abramajtys,* 929 F.2d 264, 267 (6th Cir.1991).

and magnitude to be cognizable in federal habeas corpus review...." *Bagby v. Sowders,* 894 F.2d 792, 797 (6th Cir.), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2626, 110 L.Ed.2d 646 (1990); *United States ex rel. Peery v. Sielaff,* 615 F.2d 402, 404 (7th Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980). Failure to instruct on lesser included offenses may be cognizable on habeas review if "a fundamental miscarriage of justice ... resulted from the arbitrary and unsupportable denial of a lesser included offense instruction in clear defiance of state law...." *Bagby v. Sowders,* 894 F.2d at 795; *see Prather v. Rees,* 822 F.2d 1418, 1423 (6th Cir.1987).

■ "[V]oluntary manslaughter is a cognate lesser included offense of murder." *People v. Pouncey,* 437 Mich. 382, 388, 471 N.W.2d 346 (1991). Several components "comprise the test for voluntary manslaughter: First, the defendant must kill in the heat of passion. Second, the passion must be caused by an adequate provocation. Finally, there cannot be a lapse of time during which a reasonable person could control his passions." *Id.* "A Michigan defendant may request and receive ... a cognate lesser included offense instruction if the evidence adduced at trial would support a conviction of the requested lesser offense." *People v. Beach,* 429 Mich. 450, 465–465, 418 N.W.2d 861 (1988).

Petitioner's theory in this case was that he was not present at the crime scene and that he could not have killed Larry Hooper. T at 431, 599, 713. Petitioner testified that Ronald Taylor approached him about stealing a motorcycle, but he (petitioner) was not interested in stealing a motorcycle. T at 582. Petitioner also testified that he did not know Larry Hooper, he did not go to Larry Hooper's house, and he did not fight with Larry Hooper on July 29, 1982. T at 599. Additionally, petitioner testified that he was at home on the evening of July 28, 1982, that he was asleep on the morning of July 29, 1982, when the alleged incident occurred, and that he stayed at home until Friday, July 30, 1982. T at 601–602.

Forensic pathologist Dr. Werner Spitz testified that Larry Hooper had been struck by six bullets. T at 162–163. Evidence technician Stanley Vorzell found 7 bullet casings at the crime scene. T at 205. Michael Arrowood testified that the seven bullets were fired from the same firearm. T at 238–239.

The prosecution implied that the seventh bullet struck petitioner in the leg. T at 657–659. Petitioner claimed that he injured his leg the night before the alleged incident when the gun discharged as he slept. T at 588. Despite the alleged accident, he did not seek medical assistance, but asked a friend to cut the bullet out of his leg. T at 590–593.

Petitioner's testimony and other evidence presented by the defense did not warrant an instruction on voluntary manslaughter. An instruction on voluntary manslaughter would have been incompatible with petitioner's alibi defense. Significantly, defense counsel did not request an instruction on voluntary manslaughter. T at 718. Thus, the trial court's failure to instruct on voluntary manslaughter did not clearly defy state law and was not a fundamental miscarriage of justice.

### III. *Conclusion*

For the reasons given above, the Court finds that petitioner's claims have no merit. Accordingly, the Court DENIES the petition for a writ of habeas corpus.